UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DIANNA ROCKWOOD

        Plaintiff,

    v.                       **REPORT AND RECOMMENDATION**
                                       **06-CV-1471 (NAM)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

        Defendant,

**Jurisdiction**

1.  This case was referred to the undersigned for Report and Recommendation,
by the Honorable Norman A. Mordue on November 18, 2008, pursuant 28 U.S.C. §
636(b)(1)(B), and is presently before the Court on motions for judgment on the
pleadings as supported by Plaintiff's Brief of August 31, 2007 and Defendant's Brief of
October 15, 2007.[2] This Court has jurisdiction under 42 U.S.C. §§ 405(g), 1383(c)(3).

**Background**

2.  Plaintiff Dianna Rockwood challenges an Administrative Law Judge's ("ALJ")
determination that she is not entitled to supplemental security income ("SSI") or
disability insurance benefits ("DIB") under the Social Security Act ("the Act"). Plaintiff
alleges she has been disabled since February 26, 2002, because of a herniated disc,
arthritis, depression and anxiety (R. at 42, 56, 96).[3] Plaintiff has met the disability

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to
Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.
[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such
filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as
if both parties had accompanied their briefs with a motion for judgment on the pleadings…"
[3] Citations to the underlying administrative record are designated as "R."

insured status requirements of the Act at all times on or before the date of the ALJ's decision.

## Procedural History

3.   Plaintiff protectively filed an application for DIB and SSI on January 5, 2004 (R. at 53). Her application was denied initially on May 28, 2004 and, under the prototype model of handling claims without requiring a reconsideration step, Plaintiff was permitted to appeal directly to the ALJ (R. at 15-20, 103-09). See 65 Fed. Reg. 81553 (Dec. 26, 2000). Plaintiff filed a timely request for a hearing before an ALJ, and on April 14, 2005, Plaintiff and her counsel appeared before an ALJ (R. at 26-27, 29-32, 265-93). The ALJ held a supplemental hearing on August 19, 2005, at which Plaintiff, her attorney, and a vocational expert appeared (R. at 36-39, 41, 242-64). The ALJ considered the case de novo, and on September 23, 2005, issued a decision finding that Plaintiff was not disabled (R. at 6-14).

4.   Plaintiff requested review by the Appeals Council, who denied Plaintiff's request on July 11, 2007 (R. at 3-5). The ALJ's September 23, 2005 decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

5.   On December 7, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court to review the decision of the ALJ pursuant to Sections 405(g) and 1383(c)(3) of the Act, reverse the decision of Defendant, and grant SSI and  DIB benefits to Plaintiff. The Defendant filed an Answer to Plaintiff's Complaint on February 14, 2007, requesting that the Court dismiss Plaintiff's Complaint. Plaintiff

2

submitted a Memorandum of Law on August 31, 2007. [hereinafter "Plaintiff's Brief"]. On October 15, 2007, Defendant filed a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. [hereinafter "Defendant's Brief"]. After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

6.  For the reasons set forth below, it is recommended that the Plaintiff's motion for judgment on the pleadings be GRANTED in part, and Defendant's cross-motion for judgment on the pleadings be DENIED.

**Facts**

**A.    Treating Sources**

**1.    Dr. Paul L. Penar, Fletcher Allen Health Care**

7.  On September 28, 1998, Plaintiff was treated by Paul L. Penar, M.D., a neurosurgeon with Fletcher Allen Health Care at the University of Vermont (R. at 185-86). Plaintiff complained of sudden onset of low back pain beginning three to four months prior to the appointment, persisting since that time despite two courses of physical therapy (R. at 185). Plaintiff reported trying 800 mg of ibuprofen every eight hours, without significant relief. Id. Plaintiff denied pain, numbness, or weakness in her lower extremities. Id. Upon examination, Plaintiff had "5/5" muscle strength in all extremities and her sensation was intact. Id. Her ankle and knee reflexes[4] were "1+"

---

[4] Deep tendon reflexes are tested to examine for abnormalities in "muscles, sensory neurons, lower motor neurons, and the neuromuscular junction; acute upper motor neuron lesions; and mechanical factors such as joint disease." Neuroexam, Deep Tendon Reflexes, http://www.neuroexam.com/content.php?p=31 (last visited Feb. 11, 2009). These reflexes are often rated on a scale of zero to five, where one, two, and three, indicate normal reflexes, and zero, four and five are considered abnormal. Id. A rating of zero indicates the reflex is absent. Id.

bilaterally and her back did not appear to have any scoliosis,[5] kyphosis,[6] or lordosis.[7] Id. Plaintiff's lumbosacral spine was non-tender and she exhibited a normal degree of flexion, but extension limited to 30 degrees. Id. Dr. Penar stated that Plaintiff's MRI revealed a "probable central disc fragment which is mildly compressing the thecal sac and is abutting the left S1 nerve root but not significantly compressing it." Id. Dr. Penar opined that surgery was unlikely to significantly relieve Plaintiff's pain "because she has significant degenerative disease of the disc space and her primary problem is back pain and not radiculopathy." Id. Dr. Penar suggested Plaintiff try a TENS units for pain control (R. at 185, 187).

Dr. Penar examined Plaintiff again in June of 2004 (R. at 183-84). Upon examination, Dr. Penar found Plaintiff's strength intact in her lower extremities (R. at 183). He could not reproduce pain with straight leg raising, but did so with mild flexion and extension of the lumbar area. Id. Plaintiff's knee reflexes were "1+" but Dr. Penar could not obtain ankle reflexes. Id. Dr. Penar compared a 2004 MRI study to his 1998 study and concluded that Plaintiff still had "a left paracentral disc herniation at the L5-S1 which [was] displacing the left S1 root." Id. Dr. Penar noticed the herniation had "gotten very slightly more prominent" and the disc space at L5-S1 was darker than at L4-5. Id. Dr. Penar noted that Plaintiff was "fairly obese with a weight of 260 and a height of 5'9"." Id. Dr. Penar did not think that removing the disc herniation would vastly improve Plaintiff's pain, but was willing to consider the possibility (R. at 184). Dr. Penar sent Plaintiff for "an S1 root block to assess her response" and noted, for a "more global

---

[5] Scoliosis is an "appreciable lateral deviation in the normally straight vertical line of the spine." Dorland's Illustrated Medical Dictionary 1706 (31st ed. 2007) [hereinafter Dorland's].
[6] Kyphosis is "an area of the spinal column that is convex." Id. at 1007.
[7] Lordosis is "a concave portion of the spinal column." Id. at 1090.

4

surgical solution" the only treatment was "instrumented fusion" for which he did not feel she was a good candidate, but would refer her to the Spine Institute for an evaluation. Id. Dr. Penar finished by stating, "[c]ertainly weight loss and smoking cessation would be of benefit to her." Id.

### 2.    Dr. Alan Folsom, Urgicare

On August 27, 2001, Plaintiff was seen by Dr. Alan L. Folsom, M.D., at Urgicare (R. at 116). On a form entitled, "Return to Work or School," Dr. Folsom noted that Plaintiff had been in his care for "lumbar muscle strain" and would need a "total disability recheck." Id. On August 30, 2001, on a prescription pad, Plaintiff was ordered "off work X 5 days." Id. On September 4, 2001, on a "Return to Work or School" form, Dr. Folsom indicated Plaintiff had been in his care for muscle strain and could return to "full duty" on September 5, 2001 (R. at 115).

### 3.    Nurse Paula Covey, Lake City Primary Care

On February 22, 2002, family nurse practitioner, Paula Covey examined Plaintiff for thoracic pain, but most of her notes are illegible (R. at 112). On a prescription pad, Nurse Covey noted that Plaintiff was out of work that Friday and could return to work on the following Monday but was restricted to lifting only 20 pounds for two weeks (R. at 113-14). On February 26, 2002, Nurse Covey wrote on a prescription pad that Plaintiff was "out of work until further notice" (R. at 113).

### 4.    Dr. Michael T. Borrello, Fletcher Allen Pain Management

On July 8, 2002, Plaintiff was given a medial branch block[8] by Dr. Michael T.

---

[8] A medial branch nerve block is a procedure in which regional anesthesia is achieved by injecting "anesthetics in close proximity to the nerve whose conductivity is to be cut off." Dorland's, supra note 5, at 231.

Borrello at Fletcher Allen Pain Management Center (R. at 117-18). Dr. Borrello noted that Plaintiff had a lumbar epidural steroid injection in September of 2001 that improved her lower extremity radicular pain at that time (R. at 117). Dr. Borrello administered a medial branch block to lumbar 4, lumbar 5, and the sacral ala, which Plaintiff tolerated without difficulty. Id.

### 5.    Champlain Valley Physician's Hospital ("CVPH")

Dr. John H. Miller, M.D., began treating Plaintiff at CVPH Medical Center on February 5, 2004 (R. at 178-81). Upon examination, Plaintiff exhibited normal gait and station (R. at 179). She had "5/5" muscle strength and normal muscle tone throughout. Id. Straight leg raise testing was positive on both sides and Plaintiff lacked extension and was limited to fifteen degrees flexion in her back due to pain. Id. Plaintiff's reflexes were absent at the triceps, biceps and ankles, but "1+" at the brachioradialis[9] and knees. Id. Plaintiff's sensation was intact and symmetric throughout. Id. Dr. Miller noted that Plaintiff had undergone epidural injections that worked only temporarily and were no longer an option (R. at 180). He noted that Plaintiff disliked drugs, finding muscle relaxers made her sleepy and she sometimes refused Percocet.[10] Id. Dr. Miller noted Plaintiff had unsuccessfully tried physical therapy on at least two occasions. Id. He noted that Plaintiff would occasionally use a walker. Id. Plaintiff described her pain as progressively getting worse and reaching a constant eight on a ten point scale. Id. Dr. Miller ordered an MRI to look for neural impingement. Id. Additionally, Plaintiff complained of depression and anxiety, stating she would get angry over "stupid things."

---

[9] The brachioradialis is a muscle in the forearm. See Id. at 1222.
[10] Percocet is a mixture of oxycodone hydrochloride and acetaminophen used for the relief of moderate to moderately severe pain. Physicians' Desk Reference 973 (47th ed. 1993) [hereinafter PDR].

Id. Dr. Miller found Plaintiff alert and appropriate, with good judgment and insight, normal memory, okay mood, and full affect (R. at 179). Dr. Miller noted that Zoloft[11] seemed to control her symptoms "quite well" whereas other drugs, such as Paxil,[12] caused adverse side-effects (R. at 180). Dr. Miller continued Plaintiff on Zoloft. Id.

Dr. Miller examined Plaintiff on March 1, 2004 (R. at 176-77). Plaintiff complained of worsening back pain (R. at 176). Plaintiff exhibited no gait instability and Dr. Miller found no tenderness to palpation in her back. Id. Plaintiff's muscle tone was normal and her muscle strength was a "5/5." Id. Plaintiff's left knee reflex was a two, the right knee reflex a one, and the ankle reflexes were both a one. Id. Plaintiff's sensation was intact and symmetrical. Id. After reviewing Plaintiff's latest MRI, Dr. Miller stated it was "remarkable only for left paracentral L5-S1 disc herniation with mild displacement of the left S1 nerve root and abutting the right S1 nerve root, but no displacement or impingement. No canal stenosis[13]" (R. at 177). Dr. Miller characterized the MRI as "fairly unimpressive." Id. Dr. Miller stated Plaintiff "may have some mild irritation of the left S1 nerve root, which is the side she is more symptomatic on." Id. Dr. Miller characterized Plaintiff's examination as "fairly unremarkable" noting she had some decreased reflexes, mostly on the right knee. Id. Dr. Miller ordered an electromyogram ("EMG")[14] of Plaintiff's lower extremities to determine "if the disk [sic] herniation truly is

---

[11] Zoloft is an antidepressant. Id. at 1854.
[12] Paxil is a psychotropic drug indicated for the treatment of major depressive disorder. RxList, Paxil, http://www.rxlist.com/paxil-drug.htm (last visited Feb. 11, 2009).
[13] Spinal stenosis is a "narrowing of the vertebral canal, nerve root canals, or inter-vertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equine and include pain, paresthesias, and neurogenic claudication." Dorland's, supra note 5, at 1795.
[14] Electromyography is a diagnostic technique used to measure the action potentials and evoked potentials of skeletal muscles in various states, which translates to assessing the functional status of muscles and the nerves controlling those muscles based on their electrical activity. See Id. at 609.

causing the patient's symptoms." Id. Dr. Miller noted that Plaintiff's depression was improved on Zoloft and continued her prescription. Id.

On April 23, 2004, Dr. Miller signed, dated, and returned a disability assessment form to the State agency, on which he indicated he could not provide a medical opinion regarding Plaintiff's ability to do work-related activities[15] (R. at 137-38).

Dr. Miller treated Plaintiff on May 12, 2004 (R. at 174-75). Plaintiff continued to complain of low back pain but had no significant changes in her symptoms (R. at 174). Dr. Miller reviewed Plaintiff's EMG, which showed "denervation potentials in L5 with entrapment of the right posterior tibial nerve and the left posterior tibial nerve at the level of the tarsal tunnel." Id. Dr. Miller assessed Plaintiff with "[c]hronic low back pain with some degenerative changes on exam" (R. at 175) Dr. Miller noted that Plaintiffs disc herniation displaced the left S1 nerve root, but her symptoms were more on the right side than on the left side and in an L5 distribution. Id. Dr. Miller referred Plaintiff to Dr. Penar and aqua therapy. Id. Plaintiff reported that she stopped taking Zoloft three weeks prior because it caused her to grind her teeth. Id. Plaintiff complained of insomnia, stating she was sleeping soundly only one and a half to two hours each night. Id. Dr. Miller noted Plaintiff exhibited good judgment and insight, was alert and oriented, had normal memory, good mood, and full affect. Id. Dr. Miller prescribed a trial of Remeron.[16] Id.

Dr. Miller treated Plaintiff again on June 9, 2004 (R. at 172-73). Plaintiff only

---

[15] The Court notes that Plaintiff's attorney stated in his Brief that it is the policy of CVPH that doctors should not complete such forms. Plaintiff's Brief, p. 16. Plaintiff's attorney stated: "On information and belief, Dr. Miller (and the other doctors at the CVPH Clinic), as a matter of policy, does not complete disability reports for anyone because he is too busy at CVPH Clinic (which is the only provider of primary care to Medicaid recipients in Plattsburgh)." Plaintiff's Brief, p. 7, n.1.

[16] Remeron is an antidepressant indicated for treatment of major depressive disorder. RxList, Remeron, http://www.rxlist.com/remeron-drug.htm (last visited Feb. 11, 2009).

attended the initial physical therapy appointment because the treatment caused a significant increase in her pain (R. at 172). Dr. Miller explained that her symptoms may initially worsen but would ultimately improve with physical therapy and recommended she continue the physical therapy. Id. Plaintiff complained of back pain, rating it a seven out of ten. Id. Plaintiff was still averse to pain medications because of their sedative qualities and her sensitive reactions to such medications. Id. On examination, Dr. Miller noted Plaintiff was tender to palpation over the sciatic notches bilaterally. Id. Plaintiff's range of motion in extension and flexion was limited due to pain. Id. Her muscle strength was "5/5" and her muscle tone was normal. Id. Plaintiff reported the Remeron left her very sedated into the next day and she ceased taking it. Id. At Plaintiff's request, Dr. Miller prescribed Zoloft again. Id.

On July 7, 2004, Plaintiff noted no significant changes (R. at 170). Plaintiff had not returned to physical therapy but had been examined by Dr. Penar. Id. On examination, Dr. Miller noted Plaintiff had good muscle strength and tone and tenderness over sciatic notches. Id. Dr. Miller reduced Plaintiff's Zoloft prescription because the higher dose was making her "spac[e]y" (R. at 171).

On October 8, 2004, Plaintiff reported to Dr. Miller that she completed physical therapy with no significant change in her level of pain (R. at 168). Plaintiff reported that she had not had the nerve block of the S1 that Dr. Penar recommended because the test would assess her for surgery, and Plaintiff was unwilling to consider surgery unless her symptoms got much worse. Id. Plaintiff complained of bilateral hand numbness, which Dr. Miller noted was consistent with carpal tunnel syndrome (R. at 168-69). Dr. Miller prescribed wrist splints to be worn at night (R. at 169). Plaintiff reported seeing a

9

Dr. Smith for therapy and "doing well with his help."[17] Id. Dr. Miller noted Plaintiff had no anhedonia or anorexia. Id. Plaintiff stated she found Zoloft helpful and Dr. Miller prescribed a low dose for one week. Id. The doctor then increased the dose. Id. Dr. Miller assessed Plaintiff as "doing fairly well at the moment." Id.

Dr. Miller treated Plaintiff on February 9, 2005 (R. at 191-92). Plaintiff had received the S1 nerve root block with no significant change in her symptoms (R. at 191). Dr. Miller noted Plaintiff's next option was to consider fusion at the Spine Institute, but she was unwilling to consider fusion at that point. Id. Dr. Miller noted that Plaintiff had tried Skelaxin[18] with no relief and was still taking prescription strength ibuprofen. Id. Plaintiff complained of more upper back pain. Id. Dr. Miller noted that Plaintiff did "seem to have some component of muscle spasm in the erector spinae[19] muscles of her lumbar and thoracic spine." Id. Dr. Miller continued Plaintiff's prescriptions for ibuprofen and Flexeril.[20] Id. Dr. Miller had taken Plaintiff off of Zoloft and tried Topamax,[21] but Plaintiff stopped taking Topamax after two weeks because she experienced no positive effect (R. at 192). Plaintiff reported getting very frustrated with her boyfriend while playing cards, stabbing his hand with a pen, and then crying. Id. Dr. Miller found Plaintiff had no suicidal or homicidal ideation, no anorexia, but was experiencing insomnia and

---

[17] There are no records from a Dr. Smith in the record.
[18] Skelaxin is a preparation of metaxalone indicated in conjunction with rest, physical therapy and other measures, for the relief of discomfort associated with acute, painful musculoskeletal conditions. PDR, supra note 10, at 863.
[19] Erector spinae are the muscles of the spine. Dorland's, supra note 5, at 1223.
[20] Flexeril is a preparation of cyclobenzaprine hydrochloride indicated for the treatment of muscle spasms associated with acute, painful musculoskeletal conditions. PDR, supra note 10, at 1523.
[21] Topamax is a preparation of topiramate indicated for use in treating epileptic seizures and migraines. RxList, Topomax, http://www.rxlist.com/topamax-drug.htm (last visited Feb. 11, 2009).

was "positive" for anhedonia. Id. Dr. Miller noted that Plaintiff had been on Ativan,[22] Ambien,[23] Celexa,[24] and Prozac,[25] which all either acted like "speed" or had no positive effect. Id. Dr. Miller observed Plaintiff had good judgment and insight, normal memory, was alert and oriented, had an okay mood, and full affect. Id. Dr. Miller prescribed Effexor.[26] Id.

On March 21, 2005, Plaintiff reported that the Flexeril she was taking at night to help her sleep was working somewhat but she could not use it on a regular basis because it made her groggy (R. at 189). Dr. Miller observed Plaintiff had a normal station and gait and that her back pain was relatively unchanged. Id. Dr. Miller noted that Plaintiff had stopped taking Effexor because it made her feel "speedy." Id. Plaintiff reported still getting angry very quickly. Id. Dr. Miller found Plaintiff did not have suicidal or homicidal ideations, anorexia, or anhedonia. Id. Dr. Miller observed Plaintiff's mood as good and her affect as full. Id. Dr. Miller prescribed a trial of Wellbutrin[27] (R. at 190). At this visit, Plaintiff also complained of obesity, stating that she continued to gain weight. Id. Dr. Miller diagnosed Plaintiff with obesity and referred her to a dietitian. Id.

Dr. Miller treated Plaintiff on April 25, 2005 (R. at 239-40). Plaintiff complained of difficulty controlling her temper and in handling stressful situations (R. at 239). She

---

[22] Ativan is a preparation of lorazepam indicated for use in the treatment of anxiety disorders. PDR, supra note 10, at 2546.

[23] Ambien is a preparation of zolpidem tartrate indicated for use in the treatment of insomnia. RxList, Ambien, http://www.rxlist.com/ambien-drug.htm (last visited Feb. 11, 2009).

[24] Celexa is a preparation of citalopram hydrobromide indicated for the treatment of depression. RxList, Celexa, http://www.rxlist.com/celexa-drug.htm (last visited Feb. 11, 2009).

[25] Prozac is a preparation of fluoxetine hydrochloride indicated for use in treating depression. PDR, supra note 10, at 943-44.

[26] Effexor is a preparation of venlafaxine hydrochloride indicated for the treatment of major depressive disorder. RxList, Effexor, http://www.rxlist.com/effexor-drug.htm (last visited Feb. 11, 2009).

[27] Wellbutrin is a preparation of bupropion hydrochloride indicated for treating depression. PDR, supra note 10, at 842.

noted that her father was in hospice care, which was stressful and required that she spend quite a bit of time helping care for him. Id. Dr. Miller noted that he had prescribed an increasing taper of Wellbutrin for Plaintiff at her last visit, but Plaintiff had not started it for fear it would be too sedating when she needed to be with her father. Id. Dr. Miller observed Plaintiff as alert and oriented, with good judgment and insight. Id. He observed her memory as normal, her mood "not great" and her affect full. Id. Dr. Miller explained that Wellbutrin should not have a sedating effect and once again prescribed the medication on an increasing taper. Id.

On June 1, 2005 and June 20, 2005, Plaintiff went to CVPH emergency room to treat pneumonia and an insect bite respectively (R. at 219-36).

On July 27, 2005, Plaintiff went to the CVPH emergency room complaining of back pain (R. at 213-17). Plaintiff described hearing a pop in her back that morning (R. at 216). Plaintiff was given Lorcet[28] and sent home with instructions to follow up with Dr. Miller (R. at 216).

On July 28, 2005, Plaintiff returned to the CVPH emergency room via ambulance complaining of acute onset of back pain (R. at 199-212). Plaintiff described her symptoms as feeling like she would pass out, and feeling nauseated, dizzy, and sweaty (R. at 202). Plaintiff reported taking hydrocodone,[29] ibuprofen 800 mg, and Flexiril. Id. The emergency room physicians ordered CT scans of Plaintiff's pelvis and abdomen (R. at 201, 208-11) and blood tests (R. at 201, 206-07). The pelvic scan revealed

---

[28] Lorcet is a preparation of hydrocodone and acetaminophen indicated for use in the treatment of moderate to moderately severe pain. Id. at 1033.
[29] Hydrocodone is indicated for the treatment of moderate to moderately severe pain. Id. at 1033.

"sclerosis[30] around the left S1 joint suggesting sacroiliitis[31]" (R. at 208). All other results were characterized as essentially negative (R. at 204). At the hospital, Plaintiff was given Dilaudid[32] (R. at 202). Plaintiff was sent home with short courses of Lorcet and Prednisone[33] and advised to follow up with her doctor (R. at 204).

Dr. Miller treated Plaintiff on July 29, 2005 for an acute onset of low back pain (R. at 237). Plaintiff described her two visits to the emergency room. Id. On her visit to Dr. Miller, Plaintiff was ambulating with a walker and had taken Lorcet and Flexeril for pain relief. Id. Plaintiff denied radiation of pain into her legs. Id. On examination, Plaintiff was tender to palpation of L5-S1, but muscle strength and tone were normal. Id. Plaintiff's knee reflexes were "2+" in both knees. Id. Dr. Miller noted Plaintiff's pain was due to "muscular strain" and he advised her to continue the Flexeril, Lorcet, and Prednisone. Id. Dr. Miller offered Plaintiff a physical therapy referral, which she refused. Id.

### 6.    Dr. Massoud Azar, Electrophysiology

At the request of Dr. Miller, Dr. Massoud Azar, M.D., performed an EMG on Plaintiff on May 5, 2004 (R. at 143). Dr. Azar noted that Plaintiff "declined needle EMG in the left lower extremity because of cramping in the right leg during the same procedure." Id. Dr. Azar's impression of the results was as follows:

1. Electrographic evidence of denervation potentials in the right L5 distribution.
2. Entrapment of the right posterior tibial nerve at the level of the tarsa [sic] tunnel.

---

[30] Sclerosis is an "induration or hardening, such as hardening of a part from inflammation, increased formation of connective tissue, or disease of the interstitial spaces." Dorland's, supra note 5, at 1705.
[31] Sacroiliitis is "inflammation (arthritis) in the sacroiliac joint." Id.at 1687.
[32] Dilaudid is hydromorphone hydrochloride, indicated for pain management where an opioid analgesic is appropriate. RxList, Dilaudid, http://www.rxlist.com/dilaudid-drug.htm (last visited Feb. 11, 2009).
[33] Prednisone is a glucocorticoid used as an anti-inflammatory and anti-rheumatic. RxList, Deltasone, http://www.rxlist.com/deltasone-drug.htm (last visited Feb. 11, 2009).

3. Entrapment of the left posterior tibial nerve at the level of the tarsa [sic] tunnel.
4. No electrographic evidence of a systemic peripheral neuropathy.

Id.

### B.      Consultative Examiners

### 1.      Dr. Nader Wassef, Orthopedic Examination

At the request of the State agency, Dr. Nader Wassef, M.D., examined Plaintiff on April 1, 2004 (R. at 119-22). Plaintiff described low back pain that was aggravated by moving, standing, sitting or lying down (R. at 119). Plaintiff also indicated moving, standing, sitting, and lying down could help the low back pain. Id. Plaintiff reported that pain radiated to both legs and was associated with numbness and tingling. Id. Plaintiff reported severe spasms in her neck and head. Id. Plaintiff reported she was able to cook four times a week, clean once a week, and shower and dress daily (R. at 120). Plaintiff reported sitting down to dress from the waist down. Id. Plaintiff reported she did laundry and shopping once a week and got help with other chores. Id. Plaintiff stated she liked to read and watch TV. Id.

Dr. Wassef observed Plaintiff was in no acute distress, had a normal gait, and could walk on heels and toes. Id. Plaintiff could squat fully but required Dr. Wassef's assistance to stand again (R. at 121). Plaintiff was able to get on and off the examining table and rise from a chair without assistance. Id. Dr. Wassef noted that his examination was limited because Plaintiff declined to undress for the examination. Id. Nonetheless, Dr. Wassef found that Plaintiff had full flexion, extension, lateral flexion, and rotary movements in the spine. Id. He detected no tenderness, no spasm, no scoliosis, and no trigger points. Id. Plaintiff's straight leg test was negative on both legs. Id. Dr. Wassef

14

observed Plaintiff had "5/5" muscle strength and no muscle atrophy or sensory abnormality. Id. Plaintiff's reflexes were observed as physiologic and equal. Id. Dr. Wassef stated, "[A]lthough I was not able to detect evidence of physical limitations, claimant indeed seems to be in pain" (R. at 122).

### 2.    Dr. Brett T. Hartman, Psychiatric Evaluation

At the request of the State agency, psychologist Dr. Brett T. Hartman, Psy.D., examined Plaintiff on May 14, 2004 (R. at 123-27). Plaintiff complained of difficulty sleeping and an increased appetite (R. at 124). Dr. Hartman found Plaintiff to be "notably overweight." Id. Plaintiff reported suffering from depressive episode throughout her life and endorsed the following symptoms: sadness, crying, social isolation, irritability, low energy, lack of motivation, hopelessness, loss of interest, and memory and concentration problems (R. at 125). Plaintiff reported that she was impatient, easily frustrated and easily overwhelmed. Id. Plaintiff reported getting along fairly well with her fiancé's family, but having only one close friend and being in contact with only one of her four children (R. at 136). Plaintiff reported spending her days watching TV, napping and doing housework. Id.

Dr. Hartman observed that Plaintiff was alert and oriented, and her speech was fluent, but somewhat monotone (R. at 125). He noted her mood was dysphoric and her affect was "restricted yet pleasant." Id. Dr. Hartman observed Plaintiff's attention and concentration were mildly impaired, noting she performed serial threes slowly (R. at 125-26). Plaintiff's memory appeared intact and her intellectual functioning was near average (R. at 126). Dr. Hartman found Plaintiff had fair judgment and insight. Id. Dr. Hartman opined that Plaintiff would be able to follow and understand simple directions

15

and had a fair ability to learn new skills and make appropriate decisions. Id. Dr. Hartman

opined that Plaintiff had mild attention and concentration problems, mild difficulty

relating adequately to others, and mild-to-moderate problems dealing appropriately with

the normal stressors of life. Id. Dr. Hartman found Plaintiff's limitations generally

consistent with her allegations (R. at 127). Dr. Hartman diagnosed Plaintiff with major

depressive disorder, moderate without psychotic feature. Id. He indicated the need to

rule out dysthymic disorder and rule out pain disorder. Id.

### C.     Residual Functional Capacity ("RFC") Analysis

On May 24, 2004, State agency psychiatrist, Mark Tatar, Ph.D. completed a

psychiatric review technique form base upon a review of Plaintiff's records (R. at 144-

57). Dr. Tatar indicated Plaintiff had major depressive disorder, which was a medically

determinable impairment but did not precisely satisfy the Listing 12.04 criteria (R. at

147). Dr. Tatar found Plaintiff had mild restrictions in activities of daily living, moderate

difficulties maintaining social functioning, moderate difficulties maintaining

concentration, persistence or pace, and found no evidence of episodes of

decompensation (R. at 154).

Also on May 24, 2004, Dr. Tatar completed a Mental RFC assessment (R. at

159-62). In the area of understanding and memory, Dr. Tatar found Plaintiff was not

significantly limited (R. at 159). In sustaining concentration and persistence, Dr. Tatar

indicated Plaintiff was moderately limited in carrying out detailed instructions, and

maintaining attention and concentration for extended periods. Id. Dr. Tatar found

Plaintiff was moderately limited in her ability to accept instructions and respond

appropriately to criticism and in her ability to get along with co-workers (R. at 160). He

16

also found Plaintiff moderately limited in her ability to respond appropriately to changes
in a work setting. Id. Dr. Tatar concluded that Plaintiff's activities of daily living did "not
appear significantly impaired by psychiatric factors" and she was able "to follow simple
instructions, sustain pace and relate to others in a work situation" (R. at 161).

### D.    Mr. Salvatore Garozzo, Vocational Expert ("VE")

On August 19, 2005, the ALJ held a supplemental hearing to elicit testimony from
VE, Salvatore Garozzo (R. at 253). The ALJ asked Mr. Garozzo to assume the Plaintiff
was 43 years old and had a GED (R. at 258). He asked Mr. Garozzo to further

> . . . assume that she can do light work, but has the following nonexertional
> impairments. Any job that she does must be a simple entry level job. She
> could make a simple decision, but there should be no complex decision
> making involved. It has to be a low stress job, one that would not require
> her to do any planning, no scheduling, no report writing, no supervising,
> no high production quotas, one that would have little or no change in the
> work environment or setting. She could have occasional, but not frequent
> interaction with co-workers. She could work in proximity with co-workers,
> but only occasionally in coordination or conjunction with them and she
> should be able to change positions as needed using a sit/stand option
> about every 20 to 25 minutes.

Id. Based upon these restrictions, Mr. Garozzo testified that Plaintiff would not be able
to do any of her past work. Id. Given the assumed limitations, Mr. Garozzo testified
Plaintiff could work as a housekeeper (R. at 259). Mr. Garozzo testified there were
1,492,000 housekeeper jobs nationally and 1,640 regionally. Id. Mr. Garozzo stated
there were no other jobs at the light level that a person with those limitations could
perform. Id. Mr. Garozzo further explained that there were no jobs at the sedentary level
that a person with the assumed restrictions could perform (R. at 260). Under
questioning by Plaintiff's attorney, Mr. Garozzo testified that, if in addition to the
assumed limitations Plaintiff could also not bend, push, pull or climb, it would affect

17

Plaintiff's ability to be a housekeeper because occasional kneeling was required. Id. Mr.

Garozzo testified that Plaintiff could not be a housekeeper if she could not lift over ten

pounds. Id. If Plaintiff had to take four half hour breaks to lie down because of pain, then

she could not be a housekeeper according to Mr. Garozzo. Id. However, Mr. Garozzo

indicated that impaired concentration and memory due to narcotic pain killers would be

less likely to impact a person's ability to be a housekeeper. Id. Mr. Garozzo assured

Plaintiff's counsel that a housekeeper position would allow a person to alternate

between sitting and standing every 20 to 25 minutes, but that it required some walking

and that taking some breaks after a period of walking would also be acceptable. Id. Mr.

Garozzo indicating that climbing stairs was only occasionally required of a housekeeper,

depending on whether a facility had an elevator (R. at 262). Mr. Garozzo testified that a

housekeeper position would require gross handling abilities (R. at 262-63).

### Discussion

#### A.  Legal Standard and Scope of Review

8.   A court reviewing a denial of disability benefits may not determine *de novo*

whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383 (c)(3); Wagner v.

Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the

Commissioner's determination will only be reversed if the correct legal standards were

not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817

F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the

ALJ applied correct legal principles, application of the substantial evidence standard to

uphold a finding of no disability creates an unacceptable risk that a claimant will be

deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

9.  "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

10.  The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the

validity of this analysis in <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-142 (1987), and it

remains the proper approach for analyzing whether a claimant is disabled.

      11.   This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

<u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); <u>see</u> <u>also Rosa v.</u>

<u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. §§ 416.920, 404.1520.

      12.   While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step. <u>See</u> <u>Bowen</u>, 482 U.S.

at 146 n.5; <u>Ferraris v. Heckler</u>, 728 F.2d 582 (2d Cir. 1984). The final step of this inquiry

is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job

qualifications by considering his physical ability, age, education, and work experience.

Second, the Commissioner must determine whether jobs exist in the national economy

that a person having the claimant's qualifications could perform. <u>See</u> 42 U.S.C. §

423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g); <u>Heckler v. Campbell</u>, 461 U.S. 458,

460 (1983).

13.  In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above:

1. The claimant meets the non-disability requirements for a period of disability and disability insurance benefits set forth in section 216(i) of the Social Security Act through December 31, 2007.
2. The claimant has not engaged in substantial gainful activity since February 26, 2002 (20 CFR §§ 404.1520(b) and 416.930(b)).
   . . . .
3. The claimant has the following severe impairments: arthritis and depression (20 CFR §§ 404.1520(c) and 416.920(c)).
   . . . .
4. The claimant does not have an impairment of combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1, Regulations No. 4 (20 CFR §§ 404.1520(d) and 416.920(d)).
5. . . . [T]he claimant has the residual functional capacity to [perform] simple entry-level light work that does not require complex decision making. She is able to make simple decisions. This position must be low stress work that requires no scheduling, no report writing, no supervision, and no high production quotas. She must have little to no change in the work environment or setting. She can have occasional but no frequent interaction with coworkers. She can work in proximity of co-workers but only occasionally in coordination or in conjunction with them. She must be able to change positions as needed using a sit/stand option every twenty to twenty-five minutes.
   . . . .
6. The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).
   . . . .
7. The claimant was born on March 13, 1962 and was 39 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR §§ 404.1563 and 416.963).
8. The claimant has at least a high school education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).
9. Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR §§ 404.1568 and 416.968).
10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR §§ 404.1560(c), 404.960(c), and 416966).
    . . . .

11. The claimant has not been under a "disability," as defined in the Social Security Act, from February 26, 2002 through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. at 8-9, 13-14)

### B.  Plaintiff's Challenge

14.   Plaintiff argues that (1) the ALJ violated the treating physician rule; (2) the ALJ erred in rejecting Plaintiff's credibility; (3) the ALJ erred in not finding Plaintiff disabled due to her spinal disorder and her mental impairment as required by Listings 1.04A and 12.04; (4) the ALJ erred in failing to properly consider Plaintiff's obesity; (5) the ALJ erred in concluding Plaintiff had the RFC to perform light work; (6) the ALJ improperly relied on the absence of prescribed therapy; (7) the ALJ improperly relied on the vocational expert's testimony which depended upon an inaccurate RFC; and (8) the ALJ did not meet the Commissioner's burden at step five.

### 1.  Plaintiff's First Allegation: The ALJ Violated the Treating Physician Rule.

15.   Plaintiff argues that the ALJ violated the treating physician rule in two ways. Plaintiff's Brief, pp. 14-17. First, Plaintiff argues that the ALJ held it against Plaintiff that Dr. Miller declined to offer his opinion. Plaintiff's Brief, p. 16. Second, Plaintiff argues that the ALJ improperly rejected the opinions of Dr. Penar, Dr. Folsom, and Nurse Covey. Plaintiff's Brief, pp. 16-17.

### a. The ALJ "Held it Against" Plaintiff That Dr. Miller Did Not Offer an Opinion.

Plaintiff argues that "ALJ Zolezzi held it against [Plaintiff] that her treating physician, Dr. Miller did not offer an opinion regarding her ability to work." Plaintiff's

Brief, p. 16. Plaintiff's attorney alleges that Dr. Miller declined to provide an opinion "based upon the policy of the CVPH 'Medicaid' Clinic." Plaintiff's Brief, p. 16.

First, even if the Plaintiff's allegations are assumed to be true, Plaintiff has not stated an issue reviewable by this Court under the Social Security Act. 42 U.S.C. § 405(g). Under the Act, the Court is empowered to modify or reverse an ALJ's decision, if that decision is based upon legal error or not supported by substantial evidence. Id.; Berry, 675 F.2d at 467. Plaintiff's claim has not identified any legal error or substantial evidence failure.

Nor has the Plaintiff averred any facts to support her claim that the ALJ "held it against" her that Dr. Miller declined to provide an opinion. The Plaintiff points to no evidence in the record or transcript to support this contention. Furthermore, a careful review of the record reveals that the only source indicating that Dr. Miller or CVPH had a "policy" against filling out disability forms is Plaintiff's attorney's statements, which are not reviewable by this Court as they are not part of the record or pleadings. 42 U.S.C. § 405(g) ("The court shall have power to enter, *upon the pleadings and transcript of the record*, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.") (emphasis added).

### b. The ALJ Improperly Rejected Other Medical Conclusions

Plaintiff also argues that the ALJ improperly rejected the "medical conclusions" from Dr. Penar, Dr. Folsom, and Nurse Covey in violation of the treating physician rule. Plaintiff's Brief, pp. 16-17. However, Plaintiff incorrectly assumes that the treating physician rule applies to Dr. Penar, Dr. Folsom and Nurse Covey.

23

The Commissioner will give controlling weight to a "treating source's opinion on the issue(s) of the nature and severity of your impairment(s)" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); see also Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999). However, not all health care providers are treating sources. A treating source is Plaintiff's "own physician, psychologist, or other acceptable medical source who provides [Plaintiff], or has provided [Plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [Plaintiff]." 20 C.F.R. § 404.1502. The regulations specify that an ongoing treatment relationship is generally found where an acceptable medical source treats a claimant "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." Id.; see, e.g., Shatraw v. Astrue, No. 7:04-CV-0510, 2008 WL 4517811, at * 11 (N.D.N.Y. Sept. 30, 2008) (finding four physicians were not treating sources because they each only treated the Plaintiff once and therefore did not develop an ongoing treatment relationship with the Plaintiff). Thus, an acceptable medical source who has treated or evaluated a claimant only a few times, or only after long intervals, may still be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the] condition(s)." 20 C.F.R. § 404.1502; see, e.g., Fernandez v. Apfel, No. 97-CV-4083, 1998 WL 812591, at *3-4 (E.D.N.Y. Apr. 20, 1998) (finding that a physician the Plaintiff saw six to eight times over the course of one and a half to two years was not a treating source because the Plaintiff did not see the physician with a frequency consistent with the severe mental impairment he claimed).

24

In this case, Dr. Penar and Dr. Folsom did not have the required ongoing treatment relationship with Plaintiff. Dr. Penar saw Plaintiff on two occasions over a period of approximately five years to analyze her MRIs and advise Plaintiff of possible surgical interventions (R. at 183-86). Plaintiff saw Dr. Folsom at Urgicare three times over a period of nine days in 2001 and never saw him again (R. at 115-16). Each time, Dr. Folsom provided Plaintiff with a prescription pad doctor's note excusing her from work for muscle strain (R. at 115-16). From these documents, it is not even clear that Dr. Folsom treated Plaintiff's back pain as no treatment notes or examination records are in the administrative transcript. Certainly neither Dr. Penar nor Dr. Folsom developed an ongoing treatment relationship with Plaintiff that was consistent with the constant back pain that she alleges. Similarly, Nurse Covey was not a treating source subject to the treating physician rule because a nurse practitioner is not an acceptable medical source. 20 C.F.R. §§ 404.1513(d), 416.913(d) (listing a nurse practitioner as an other source, and not an acceptable medical source). Instead, the record is replete with evidence that Dr. Miller regularly treated Plaintiff and formed an ongoing treatment relationship with Plaintiff that was consistent with the constant back pain that Plaintiff alleges (R. at 137-38, 168-69, 170, 172-81, 189, 191-92, 237, 239-40). As the ALJ recognized, Dr. Miller was Plaintiff's treating physician. Therefore, the ALJ did not err when he did not apply the treating physician rule to Dr. Penar, Dr. Folsom or Nurse Covey.

### 2. Plaintiff's Second Allegation: The ALJ Erred in Assessing Plaintiff's Credibility.

16. Plaintiff argues that the objective medical evidence in the record supports

Plaintiff's statements regarding pain caused by her back impairment. Plaintiff's Brief, pp. 22, 29-33. Plaintiff also argues that "[t]he record as a whole indicates that she credibly testified about her depression and anxiety." Plaintiff's Brief, p. 33.

Courts in the Second Circuit have determined pain and other limiting symptoms are important elements in disability claims, and such evidence must be thoroughly considered. See Ber v. Celebrezze, 332 F.2d 293 (2d Cir. 1964). "[A] claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence." Simmons v. U.S. R.R. Retirement Bd., 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). "However, the ALJ is 'not obliged to accept without question the credibility of such subjective evidence.'" Martone v. Apfel, 70 F.Supp.2d 145, 151 (N.D.N.Y. 1999) (quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)). When rejecting subjective complaints, an ALJ must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987); see SSR 96-7p, 1996 WL 374186, at *4. If the ALJ's findings are supported by substantial evidence, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y of Dept. of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).

The "ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record." Borush, No. 3:05-CV-361, 2008 WL 4186510, at *12 (N.D.N.Y. Sept. 10, 2008) (citing 20 C.F.R. §§ 404.1529, 416.929; Foster v. Callahan, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998)); see S.S.R. 96-7p, 1996 WL 374186, at *2. First, the ALJ must determine whether the claimant has

medically determinable impairments, "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); S.S.R. 96-7p, 1996 WL 374186, at *2. "This finding does not involve a determination as to the intensity, persistence, or functionally limiting effects of the claimant's pain or other symptoms." McCarty v. Astrue, No. 5:05-CV-95, 2008 WL 3884357, at *8 (N.D.N.Y. Aug. 18, 2008) (citing S.S.R. 96-7p, 1996 WL 374186)). "If no impairment is found that could reasonably be expected to produce pain, the claimant's pain cannot be found to affect the claimant's ability to do basic work activities." Id. Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. S.S.R. 96-7p, 1996 WL 374186, at *2; 20 C.F.R. § 404.1529(c); Borush, 2008 WL 4186510, at *12. Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," S.S.R. 96-7p, 1996 WL 374186, at *3, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 416.929(c)(3)(i)-(vii).

After reviewing the record, the Court is satisfied that the ALJ applied the proper legal standards in his analysis of Plaintiff's complaints of pain and other symptoms.

27

Further, the Court concludes that substantial evidence supports the ALJ's determination that Plaintiff's complaints were "not entirely credible." The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms" (R. at 11). "However," the ALJ concluded that "the claimant's statements concerning the intensity, duration and limiting effects of those symptoms are not entirely credible" (R. at 11). The ALJ considered Plaintiff's symptoms related to her back condition and her mental condition separately (R. at 11).

With respect to Plaintiff's back related pain, the ALJ found that the intensity, duration and frequency of Plaintiff's symptoms would not preclude work activities (R. at 11). The ALJ considered factors relevant to the second step of the credibility analysis (R. at 11-12). The ALJ noted that her daily activities were "not limited to the extent one would expect, given the complaints of disabling symptoms" (R. at 11-12). The ALJ also noted that Plaintiff did not give details about what precipitated her alleged symptoms (R. at 11).

In addition to the evidence the ALJ discussed, other substantial evidence supports the ALJ's conclusion (R. at 62-83, 270-71, 274, 282-86). For example, Dr. Miller noted that the laboratory diagnostic tests showed Plaintiff had a herniation displacing the left S1 nerve root, but that Plaintiff complained of more symptoms on the right (R. at 175). Additionally, the record reveals several instances in which Plaintiff's testimony before the ALJ was inconsistent with her statements to physicians. For example, Plaintiff told Dr. Miller that she was injured in February of 2002 while lifting a client as a home health aide, but she testified before the ALJ that her February 2002 injury stemmed from a slip (R. at 180, 274). Similarly, Plaintiff testified in April 2005 that

28

Dr. Smith had been treating her depression with individual therapy every week or every couple of weeks, on and off for the past seven years (R. at 277-78). However, in May of 2004 Plaintiff told Dr. Hartman that she had not had psychiatric treatment for the past four or five years (R. at 123).

In his credibility assessment, the ALJ also noted that Plaintiff spent a "great deal of time" helping her ill father which "can be quite demanding both physically and emotionally" (R. at 12). While Plaintiff correctly points out that her testimony did not imply she did any physical work caring for her father, the ALJ's unwarranted assumption does not mean that substantial evidence did not support the ALJ's findings. See (R. at 279); see also Barringer v. Comm'r of Soc. Sec., 358 F.Supp.2d 67, 83 n.26 (N.D.N.Y. 2005) (noting that an ALJ's incorrect rendition of facts in the record is nothing more than harmless error where his credibility assessment is amply supported by other substantial evidence).

With respect to Plaintiff's mental impairment, the ALJ concluded that the intensity, duration, and frequency of Plaintiff's symptoms "did not render her unable to perform basic work-related functions" (R. at 11). The ALJ considered that Plaintiff had "been maintained on medication" and was consistently evaluated by Dr. Miller to have a good mood and full affect (R. at 11). The ALJ also noted the Dr. Miller consistently found Plaintiff had normal memory and intact insight and judgment (R. at 11). Finally, the ALJ noted that Plaintiff was not advised to seek any other treatment (R. at 11).[34]

---

[34] In his credibility analysis, the ALJ states that Plaintiff was not receiving any therapy (R. at 11). The record does not necessarily support this particular conclusion because there are some indications that Plaintiff sought treatment from a Dr. Smith (R. at 123, 169, 277-78). However, because the ALJ's credibility analysis is otherwise supported by substantial evidence, this misstatement is nothing more than harmless error. See Barringer, 358 F.Supp.2d at 83 n.26.

29

While the record indicates that Plaintiff had difficulty controlling her temper (R. at 189, 191) and felt anxious near people (R. at 287-88) it also indicates that she was able to "relate to others in a work situation" (R. at 161).

The Court finds that the ALJ used the correct legal standard in assessing Plaintiff's credibility and that substantial evidence supports his decision.

### 3. Plaintiff's Third Allegation: The ALJ Erred in Not Finding Plaintiff Met Listings 1.04A and 12.04.

#### a. Listing 1.04A

17.  Plaintiff argues that the ALJ erred in failing to find that Plaintiff was disabled by her spinal impairment, pursuant to Listing 1.04A. Plaintiff's Brief, pp. 17-18.

Plaintiff has the burden of proof at step three to show that her impairments meet or medically equal a Listing. Naegele v. Barnhart, 433 F.Supp.2d 319, 324 (W.D.N.Y. May 31, 2006). To meet a Listing, Plaintiff must show that her medically determinable impairment satisfies all of the specified criteria in a Listing. 20 C.F.R. §§ 404.1525(d), 416.925(d). If a claimant's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify. Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (citing S.S.R. 83-19, 1983 WL 31248).

In his decision, the ALJ did not specifically refer to either Listing 1.04A or Listing 12.04, but found that Plaintiff's impairments did not, individually or in combination, meet or medically equal one of the listed impairments (R. at 9). Courts have required an ALJ to provide an explanation as to why the claimant failed to meet or equal the Listings, "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." Kuleszo v. Barnhart, 232 F.Supp.2d 44, 52 (W.D.N.Y. Sept. 30, 2002). However, if an ALJ's decision lacks an express rationale for

30

finding that a claimant does not meet a Listing, a Court may still uphold the ALJ's

determination if it is supported by substantial evidence. Berry v. Schweiker, 675 F.2d

464, 468 (2d Cir. 1982).

> Listing 1.04A, of Appendix 1, Subpart P, Regulations No. 4, states:
>
> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);…

20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, § 1.04.

In this case, there is some medical evidence that Plaintiff may have "nerve root

compression characterized by nuero-anatomic distribution of pain," "limitation of motion

of the spine," "reflex loss," and a "positive straight leg raising test;" however, there is no

evidence that Plaintiff has "motor loss." Rather, Dr. Miller, Dr. Penar, and Dr. Wassef, all

found Plaintiff's strength and muscle tone normal and intact (R. at 121, 137, 170, 176,

179, 183, 185). Furthermore, the evidence of nerve root compression, limitation of spine

motion, reflex loss, and a positive straight leg raising test is all contradicted. Thus, while

Dr. Miller and Dr. Penar noted mild displacement of the left S1 nerve root (R. at 177,

185), Dr. Penar opined that it was "not radiculopathy" (R. at 185), and Dr. Miller

characterized it as "mild irritation" and "fairly unimpressive" (R. at 177). Dr. Folsom

characterized Plaintiff's injuries as "muscle strain" (R. at 116). Similarly, while Dr. Miller

and Dr. Penar noted Plaintiff's flexion and extension were limited due to pain (R. at 172,

179, 183, 185), Dr. Wassef found Plaintiff had full flexion and extension (R. at 121). As

for loss of reflexes, Dr. Penar, Dr. Miller, and Dr. Wassef generally found Plaintiff's reflexes normal, rating them a "1+," "2+," one, or two (R. at 176, 179, 183, 185, 237), noting Plaintiff's sensation was intact (R. at 121, 176), and finding "no sensory abnormalities" and reflexes "physiologic and equal" (R. at 121). Finally, although Dr. Miller found positive straight leg raising test results on both legs (R. at 179), Dr. Penar and Dr. Wassef found negative results in straight leg raising tests (R. at 121, 183).

Plaintiff cannot meet Listing 1.04A because there is no medical evidence that she experienced motor loss, a required criterion of Listing. See Zebley, 493 U.S. at 530; see, e.g., McKinney v. Astrue, No. 5:05-CV-0174, 2008 WL 312758, at *5 (N.D.N.Y. Feb. 1, 2008) (finding the ALJ's decision that the Plaintiff did not meet Listing 1.04A supported by substantial evidence where the Plaintiff's did not satisfy all the criteria symptoms of the Listing). Therefore, the ALJ's determination that Plaintiff did not meet Listing 1.04A was supported by substantial evidence. Furthermore, the ALJ's failure to provide a specific rationale for finding Plaintiff's spinal impairment did not meet Listing 1.04A does not prevent this Court from upholding his determination because substantial evidence, as outlined above, supports the ALJ's determination. See Berry, 675 F.2d at 468.

### b. Listing 12.04

Plaintiff also argues that she was disabled by her mental impairment, pursuant to Listing 12.04. Plaintiff's Brief, pp. 23-25.

Listing 12.04 for Affective Disorders requires an impairment:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or

elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

    1. Depressive syndrome characterized by at least four of the following:

        a. Anhedonia or pervasive loss of interest in almost all activities; or

        b. Appetite disturbance with change in weight; or

        c. Sleep disturbance; or

        d. Psychomotor agitation or retardation; or

        e. Decreased energy; or

        f. Feelings of guilt or worthlessness; or

        g. Difficulty concentrating or thinking; or

        h. Thoughts of suicide; or

        i. Hallucinations, delusions, or paranoid thinking; or

    2. Manic syndrome characterized by at least three of the following:

        a. Hyperactivity; or

        b. Pressure of speech; or

        c. Flight of ideas; or

        d. Inflated self-esteem; or

        e. Decreased need for sleep; or

        f. Easy distractibility; or

        g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

        h. Hallucinations, delusions or paranoid thinking; or

    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A, § 1.04.

In this case, non-examining State psychiatrist, Dr. Tatar, found that Plaintiff had a major depressive disorder that did not meet the requirements of Part A (R. at 147). The record supports Dr. Tatar's finding that Plaintiff did not meet the requirements of Part A. For example, Dr. Miller repeatedly recorded that Plaintiff suffered from disturbed sleep (R. at 169, 175, 189, 192), and on one occasion, noted Plaintiff had "positive anhedonia" (R. at 192). Plaintiff has endorsed other symptoms required for Part A depressive syndrome, such as low energy and concentration problems (R. at 125), but none of these other required symptoms have been of "medically documented persistence." Dr. Tatar further found that Plaintiff's symptoms did not limit her to the degree required by Part B (R. at 154). This finding is also supported by the record. For example, instead of finding the marked restrictions required to meet Part B of Listing 12.04, Dr. Hartman found that Plaintiff had only mild attention and concentration problems and only mild to moderate limitations in social functioning (R. at 126-27). Furthermore, there is no evidence on record, nor does the Plaintiff allege, that Plaintiff meets the requirements of Part C. Given the lack of evidence to support Plaintiff's claim that she is disabled pursuant to Listing 12.04, the Court finds no error in the ALJ's determination that Plaintiff did not meet this Listing. The ALJ's failure to provide an express rationale for dismissing this Listing is not in error. See Berry, 675 F.2d at 468.

34

4.   **Plaintiff's Fourth Allegation: The ALJ Erred in Failing to Properly Consider Plaintiff's Obesity.**

a.      **The ALJ Erred in Not Finding Plaintiff's Obesity Severe, Alone or in Combination with Her Other Impairments**

18.  Plaintiff argues that "[t]he ALJ failed to consider her obesity as either a severe impairment in and of itself or in combination with her other impairments" or as a factor making her statements of pain credible.[35] Plaintiff's Brief, p. 27. Defendant argues that the ALJ's decision to not give "significant consideration" to obesity was reasonable because Plaintiff did not allege difficulty due to obesity, Plaintiff's weight was within its normal range, and the evidence of obesity was scant. Defendant's Brief, pp. 16-17.

In this case, the ALJ did not mention obesity anywhere in his decision. The Defendant has suggested that the ALJ's failure to mention obesity in his decision should be excused because Plaintiff never alleged obesity as a disabling condition or limiting factor. This argument is inapposite because the regulations specifically require an ALJ to consider impairments a claimant says she has or those "about which [he] receive[s] evidence." 20 C.F.R. §§ 404.1512(a); 416.912(a). In this case, the record provided ample evidence to notify the ALJ that Plaintiff suffered from obesity, including a diagnosis from her treating physician (R. at 190, 183-84,124). Additionally, the ALJ had the benefit of seeing Plaintiff at the hearing, which should also have alerted him to Plaintiff's obesity. See generally Celaya v. Halter, 332 F.3d 1177, 1183 n.3 (9th Cir. 2003) (describing different ways an ALJ may receive evidence of an unasserted obesity condition, such as seeing the Plaintiff at the hearing).

Defendant's argument, that Plaintiff was "in the range of her normal weight," is

---

[35] See supra Part B.2.a, for a discussion of the ALJ's credibility analysis.

similarly misplaced. The Social Security Administration ("SSA") has explained that obesity is "a disease characterized by excessive accumulation of body fat." Social Security Ruling 02-1p, 2000 WL 628049, at *2 (S.S.A.) [hereinafter S.S.R. 02-1p or Ruling 02-1p]. The established medical criteria used to diagnose obesity is known as the Body Mass Index ("BMI"), which is a ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m$^2$). Id. The Court notices that a claimant's "normal weight" may satisfy the definition and medical criteria for obesity. As Plaintiff correctly points out, based upon the evidence of record, Plaintiff's BMI was 38.8, which is categorized as Level II obesity. Plaintiff's Brief, p. 26; see S.S.R. 02-1p, 2000 WL 628049, at *2.

When analyzing obesity, an ALJ should rely on Ruling 02-1p, which explains how an ALJ should consider obesity at steps two through five of the sequential analysis. S.S.R. 02-1p, 2000 WL 628049. At step two, the ALJ should find obesity severe, alone or in combination with other medically determinable impairments, if "it significantly limit's an individual's physical or mental abilities to do basic work activities." Id. at *4. At step three, the S.S.R. warns that "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal . . . impairments." Id. at *5. However, the ALJ "will not make assumptions about the severity or functional effects of obesity combined with other impairments. . . . [but] will evaluate each case *based on the information in the case record*." Id. at *6 (emphasis added). Thus, courts have not found error where an ALJ fails to specifically discuss obesity at steps two and three, when the record provides no evidence the claimant is limited in basic work activities. See, e.g.,

Day v. Comm'r of Soc. Sec., No. 3:05-CV-1271, 2008 WL 2331401, at *5 (N.D.N.Y. June 3, 2008) (finding no error in the ALJ's failure to specifically address Plaintiff's obesity, reasoning there was no evidence in the record that Plaintiff's obesity, alone or in combination with other impairments, effected her ability to perform basic work activities); Yablonski v. Comm'r of Soc. Sec., No. 6:03-CV-414, 2008 WL 2157129, at *6 (N.D.N.Y. Jan. 31, 2008) (citing Cruz v. Barnhart, No. 04-CV-9011, 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006); Guadalupe v. Barnhart, No. 04-CV-7644, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005)) (finding no error where the ALJ did not consider the Plaintiff's obesity in combination with her bilateral knee arthritis or in connection with Listing 1.02 because while she was described as obese in the record there was no diagnosis of obesity, no suggestion that it contributed to her other impairments, and no opinion that it limited her basic work activities). Furthermore, at steps two and three, a claimant bears the burden of showing she is disabled according to the Act. See 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 42 U.S.C. § 1382c(a)(3)(H)(i) (applying section 423(d)(5) to SSI determinations); see 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2). Thus, a claimant's failure to present evidence of her obesity may excuse the ALJ from considering it. See, e.g., Howe-Andrews v. Astrue, No. 05-CV-4539, 2007 WL 1839891, at *7-9 (E.D.N.Y. June 27, 2007) (finding no error in ALJ's conclusion that the Plaintiff did not meet or equal a Listing when considering her obesity because ALJ explicitly found her obesity did not further limit her and because Plaintiff did not provide any evidence to the contrary despite her burden of

proof).

In this case, the ALJ did not mention obesity at steps two or three when he found that Plaintiff's arthritis and depression were severe but not severe enough to meet a Listing. However, as the Defendant correctly noted, the evidence of record regarding Plaintiff's obesity was somewhat limited. Three doctors noted Plaintiff was obese: Dr. Miller, her treating physician (R. at 124), Dr. Penar, the neurosurgeon (R. at 183), and Dr. Hartman, the State's consultative examiner (R. at 190). Dr. Penar, rather vaguely, suggested that weight loss would "certainly . . . benefit" Plaintiff (R. at 184). On the other hand, neither Dr. Miller nor Dr. Hartman opined that Plaintiff's obesity contributed to her impairments or limitations. Given Plaintiff's burden of proof, the S.S.R.'s admonition that the ALJ rely on the "information in the case record," and the relevant case law, this Court cannot say that the ALJ erred by not specifically addressing Plaintiff's obesity at steps two and three.

### b. The ALJ Did Not Properly Consider Obesity in Formulating Plaintiff's RFC

Plaintiff appears to be further arguing that Plaintiff's obesity was not properly considered in determining her RFC. Plaintiff's Brief, p. 21.

Ruling 02-1p warns that "[o]besity can cause limitation of function." S.S.R. 02-1p, 2000 WL 628049, at *6. It suggests obesity may limit exertional and postural functions, as well as a claimant's "ability to perform routine movement and necessary physical activity within the work environment" or to "sustain function over time." Id. However, before an ALJ can consider functional limitations resulting from obesity, he must first determine that obesity is a medically determinable impairment. S.S.R. 02-1p, 2000 WL

628049, at *3, 7 (explaining that body habitus is not a factor in assessing RFC because the Administration distinguishes between those claimants "who have a medically determinable impairment of obesity and individuals who do not," so ALJs will consider functional limitations resulting from obesity only when they "identify obesity as a medically determinable impairment").

In this case, it is unclear whether the ALJ considered Plaintiff's obesity to be a medically determinable impairment because the decision gives no indication the ALJ considered obesity. However, since Dr. Miller diagnosed Plaintiff with obesity, it is unlikely the ALJ could have found her obesity was not a medically determinable impairment. <u>See</u> S.S.R. 02-1p, 2000 WL 628049, at *3 ("[I]n the absence of evidence to the contrary in the case record, we will accept a diagnosis of obesity given by a treating source . . . .").

The SSA has promised with respect to assessing a claimant's RFC: "As with any other impairment, [the ALJ] will explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." S.S.R. 02-1p, 2000 WL 628049, at *7. Despite this language, some district courts, following the Seventh Circuit, have declined to remand when an ALJ fails to explicitly address obesity, reasoning that obesity is indirectly considered if the ALJ adopts limitations suggested by examining doctors. <u>Guadalupe v. Barnhart</u>, No. 04-CV-7644, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (<u>citing</u> <u>Skarbek v. Barnhart</u>, 390 F.3d 500, 504 (7th Cir. 2004)) (reasoning that the ALJ "relied on" medical evidence that made no mention that Plaintiff was obese even though it must have been apparent at the time of the assessment and thus the ALJ "sufficiently, if somewhat indirectly, accounted for Plaintiff's obesity"); <u>see,</u>

39

e.g., Martin v. Astrue, No. 5:05-CV-72, 2008 WL 4186339, *3-4, 11-12 (N.D.N.Y. Sept. 9, 2008) (finding ALJ's failure to explicitly address Plaintiff's obesity harmless error, because the ALJ "utilized" the physical limitations from various doctors who considered Plaintiff's obesity).  Other district courts have demanded an ALJ clearly indicate he considered obesity when assessing a Plaintiff's limitations. See, e.g., Hogan v. Astrue, 491 F.Supp.2d 347, 355 (W.D.N.Y. 2007) (finding error even though the ALJ found Plaintiff's obesity a severe impairment, because it was "unclear whether he considered plaintiff's obesity at steps four and five of the disability evaluation"); accord Fox v. Astrue, No. 6:05-CV-1599, 2008 WL 828078, at *11 (N.D.N.Y. Mar. 26, 2008) (finding that the ALJ sufficiently considered obesity where he discussed it in an "entire paragraph"); Cruz v. Barnhart, No. 04-CV-9011, 2006 WL 1228581, at *9-10 (S.D.N.Y. May 8, 2006) (reasoning that the ALJ sufficiently considered the Plaintiff's obesity when he mentioned obesity in his factual findings).[36]

Here, even assuming that the Seventh Circuit's approach is correct, this Court cannot conclude the ALJ indirectly considered Plaintiff's obesity because the ALJ did not adopt, utilize, or rely upon any examining doctor's opinions of Plaintiff's physical

---

[36] *Cruz* also states that "there is no obligation on an ALJ to single out a claimant's obesity for discussion in all cases." Cruz v. Barnhart, No. 04-CV-9011, 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006). This language has since been frequently repeated, see e.g., Day v. Comm'r of Soc. Sec., No. 3:05-CV-1271, 2008 WL 2331401, at *5 (N.D.N.Y. June 3, 2008) (noting that "there is no obligation on an ALJ to single out a claimant's obesity for discussion in all cases"), without reconciling it with the SSA's assurance that the ALJ "will explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." S.S.R. 02-1p, 2000 WL 628049, at *7. It could be argued that the *Cruz* holding contradicts the SSA's Ruling by relieving the ALJ of the obligation to explain his or her conclusions regarding obesity. However, this Court need not reach that issue in this particular case. As noted above, *Cruz* only applies when the ALJ has adopted an examining physician's assessment of the plaintiff's physical limitations, thereby at least implicitly considering the impact of obesity. In the present case, because there is no indication in the record that the ALJ considered obesity (either explicitly or implicitly), remand is required under both the *Cruz* standard and the more restrictive reading of the SSA's Ruling adopted by other courts.

limitations. Moreover, in light of the plain language of Ruling 02-1p, and the ALJ's failure to indicate to the Court that he was even aware of evidence showing Plaintiff suffered from obesity, this Court recommends the decision be remanded for further consideration of Plaintiff's obesity, and an explanation thereof as required by Ruling 02-1p.

The Court is cognizant of Defendant's argument that the evidence of Plaintiff's obesity is scant. However, in assessing a claimant's RFC, S.S.R. 02-1p does not limit an ALJ to "information in the case record." S.S.R. 02-1p, 2000 WL 628049, at *6. Instead, the regulations place responsibility on the Commissioner to "develop[] [Plaintiff's] complete medical history," despite Plaintiff's own responsibility to provide evidence. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Moreover, in the Second Circuit, an ALJ has an affirmative duty to develop the record, even if the claimant is represented by counsel, if the medical record is ambiguous or incomplete. See Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir.1999); Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (noting that where there are gaps or ambiguities in the record, the ALJ bears the affirmative obligation to develop the record). Therefore, if on remand, the ALJ's analysis is hampered by a lack of evidence, he should further develop the record. See 20 C.F.R. §§ 404.1512(e)-(f), 416.912(e)-(f) (explaining that when the evidence is inadequate to determine whether a claimant is disabled, the SSA will recontact a treating source, or if one is not available, ask for one or more consultative examinations).

### 5. Plaintiff's Fifth Allegation: The ALJ Erred in Concluding Plaintiff had the RFC to Perform Light Work.

19.  Plaintiff argues that the ALJ's RFC was flawed because it failed to include "her impairments and non-exertional limitations, including pain, . . . and side effects of

her medications." Plaintiff's Brief, p. 21.

### a. The RFC was Flawed Because the ALJ Did Not Properly Consider the Non-Exertional Limitations Caused by Plaintiff's Pain

Plaintiff argues that she "did not have the RFC to perform any work because of her non-exertional limitation of pain." Plaintiff's Brief, p. 21. However, Plaintiff does not specify what non-exertional limitations were improperly excluded from her RFC. After reviewing the record, the Court assumes Plaintiff is referring to her statements that: she cannot "walk[,] sit[,] lay[,] stand" since her injuries (R. at 63, 280); she has difficulty laying down for extended periods of time; she does not "do any walking because of the pain" and sometimes does not drive due to pain (R. at 65); she has a hard time standing for long periods of time and she has a hard time bending over (R. at 75); she needs to hold onto something and bend at the knees to pick something up from the floor (R. at 281); and she has to stop while doing household chores or not do them at all due to pain (R. at 83).

An RFC is the most a claimant can still do despite limitations. 20 C.F.R. §§ 416.945(a)(1), 404.1545(a)(1). In formulating the RFC, the ALJ must consider all the relevant evidence on the record, including physical abilities, mental abilities, symptomatology, such as pain, and other limitations that could interfere with work activities on a regular and continuing basis. Id.; Martone v. Apfel, 70 F.Supp.2d 145, 150 (N.D.N.Y. 1999). The Court has already determined that the ALJ's finding that Plaintiff was not entirely credible was not the product of legal error and was supported by substantial evidence. However, even if the ALJ excluded certain limitations because he found Plaintiff not fully credible, the regulations still required the ALJ to "assess

42

[Plaintiff's] physical abilities . . . such as sitting, standing, walking, lifting, carrying, pushing, [and] pulling, . . . including manipulative or postural functions, such as reaching, handling, stooping or crouching." 20 C.F.R. §§ 404.1545(b), 416.945(b). The ALJ must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." Social Security Ruling 96-8p, 1996 WL 374184, at *1 (S.S.A.) [hereinafter S.S.R. 96-8p]. Moreover, as discussed above, Ruling 02-1p requires the ALJ to explain his conclusions on whether obesity caused any limitations. S.S.R. 02-1p, 2000 WL 628049, at *7.

In this case, the ALJ articulated many specific functional abilities in Plaintiff's RFC, but failed to specify Plaintiff's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop or crouch—abilities in which Plaintiff could reasonably be expected to experience limitations given her allegations of a disabling back impairment. Instead, the ALJ determined:

> Upon careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to [perform] simple entry-level light work that does not require complex decision making. She is able to make simple decisions. This position must be low stress work that requires no scheduling, no report writing, no supervision, and no high production quotas. She must have little to no change in the work environment or setting. She can have occasional but no frequent interaction with coworkers. She can work in proximity of co-workers but only occasionally in coordination or in conjunction with them. She must be able to change positions as needed using a sit/stand option every twenty to twenty-five minutes.

(R. at 9). Although the ALJ's RFC determination is fairly lengthy, his failure to indicate Plaintiff's exertional and postural abilities on a function-by-function basis is error. Hogan v. Astrue, 491 F.Supp.2d 347, 354 (W.D.N.Y. 2007) (finding error in ALJ's failure to

"determine plaintiff's ability to sit, stand, walk, lift and carry" as required by the regulations); Crysler v. Astrue, 563 F.Supp.2d 418, 437-38 (N.D.N.Y. 2008) (remanding where the ALJ found the Plaintiff could perform sedentary work, but failed discuss to what extent she could lift, carry, walk, stand, sit, withstand postural, manipulative, or environmental conditions); see generally Miles v. Barnhart, No. 6:06-CV-391, 2008 WL 5191589, at  *9 n.4 (N.D.N.Y. Dec. 8, 2008) (collecting cases remanding on failure to determine limitations on a function-by-function basis and noting that only the Southern District in New York has consistently found function-by-function analysis "desirable" but not mandatory). The Court notes, that regardless of whether substantial evidence supported the ALJ's RFC determination, where "reasonable basis for doubt" exists as to whether correct legal principles were applied, the substantial evidence standard may not be used to uphold the ALJ's decision. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir.1987).

In this case, the ALJ's failure to specify Plaintiff's abilities to sit, stand, walk, reach, handle, stoop, or crouch is particularly important because the ALJ's conclusion that Plaintiff is not disabled hinges on his finding that she has the RFC to be a housekeeper (DOT 323.687-014) (R. at 14). See S.S.R. 96-8p, 1996 WL 374184, at *3-4. The housekeeper position indicated requires a person to occasionally stoop, kneel, and crouch, to frequently reach and handle, and to occasionally exert twenty pounds of force, frequently exert up to ten pounds of force, and constantly exert a negligible amount of force. Dictionary of Occupational Titles, 323.687-014 Cleaner, Housekeeping, 1991 WL 672783 (4th ed. 1991). Additionally, a light work position generally "requires a good deal of walking or standing." 20 C.F.R. §§ 404.1567(b),

44

416.967(b). Moreover, the ALJ was aware of the potential postural requirements of the position. Plaintiff's attorney asked Mr. Garozzo if an inability to "bend, push, pull, or climb" would affect a person's ability to be a housekeeper (R. at 260). Mr. Garozzo replied, "Yes, Mr. Schneider. According to the classification of jobs, occasional kneeling is required for the position as a housekeeper." Furthermore, Mr. Garozzo testified that given Plaintiff's restrictions, she could not perform any sedentary jobs or any other jobs in the light work category (R. at 259-60). Thus, absent a finding that Plaintiff could be a housekeeper, it appears the ALJ would have had to find Plaintiff disabled within the meaning of the Act.

As described in S.S.R. 96-8p, an ALJ's failure to consider a claimant's work-related functions separately from an exertional category "could be critical to the outcome of a case" because the failure to determine a claimant's function-by-function abilities could result in the ALJ overlooking some of the claimant's limitations, and incorrectly finding the claimant can perform work based on an exertional category. S.S.R. 96-8p, 1996 WL 374184, at *3-4; see, e.g., Murphy v. Barnhart, No. 00-CV-9621, 2003 WL 470572, at *9 (S.D.N.Y. Jan. 21, 2003) (remanding for function-by-function analysis where the ALJ found claimant could perform all sedentary work and therefore her past work as an administrative assistant, without considering evidence her right hand was functionally impaired and she had difficulty writing); see also, Zahirovic v. Astrue, No. 6:06-CV-981, 2008 WL 4519198, at *8 (N.D.N.Y. Sept. 30, 2008) (remanding for the ALJ to conduct a function-by-function analysis, particularly of those limitations "which could reasonably be expected to be present based upon the nature of plaintiff's medical condition"). The ALJ's decision in this case poses such a risk.

45

Because the ALJ failed to specify Plaintiff's functional capacities to sit, stand, walk, reach, handle, stoop, or crouch, it is possible that he incorrectly determined she had the RFC to perform the position of a housekeeper.

In sum, Plaintiff alleges that her limitations prevent her from performing the position of housekeeper. The performance of such work requires functional abilities that the ALJ did not include in his assessment. Thus, in the absence of a function-by-function analysis, the Court cannot determine whether the ALJ incorrectly overlooked some of Plaintiff's limitations. Accordingly, this court recommends remand for further consideration as to this issue.

The Court further notes that the ALJ may need to develop the record when reconsidering this issue. In particular, the Court notes the contradiction between Dr. Wassef's notation that Plaintiff needed assistance to rise from a full squat, and his conclusion that he "was not able to detect evidence of physical limitations" (R. at 121-22). Furthermore, no medical source completed a physical RFC assessment of Plaintiff. Thus, the ALJ had "no other assessments on which to [rely to] provide him [with] guidance in formulating Plaintiff's RFC." Derouin v. Comm'r of Soc. Sec., No. 7:05-CV-211, 2008 WL 4279503, at *7 (N.D.N.Y. Aug. 18, 2008). Therefore, the Court suggests the ALJ examine the medical evidence of record before formulating Plaintiff's RFC.

### b.  The RFC was Flawed Because the ALJ Did Not Properly Consider the Limitations Due to the Side Effects of Plaintiff's Medications

The Plaintiff argues that the record shows she "has side effects [from] her various psychotropic medications and pain medications." Plaintiff's Brief, p. 23. Specifically, Plaintiff argues that the evidence shows she "gets very sleepy" or "speedy," and "cannot

46

focus or concentrate" while on some medications, and she gets headaches and grinds her teeth while on Zoloft. Plaintiff's Brief, p. 23. Defendant argues that the ALJ considered the issue when he asked Plaintiff about medication side effects at her hearing and she denied experiencing them. Defendant's Brief, p. 17 n.6.

In formulating Plaintiff's RFC, the regulations require the ALJ to base his assessment "on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1). However, this obligation "does not impose the onus to 'specifically *address* each piece of evidence in his decision.'" Derouin, 2008 WL 4279503, at *4 (quoting Jones v. Barnhart, [No. 04-CV-2772,] 2004 WL 3158536, at *6 (E.D.N.Y. Feb 3, 2004)); see also Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (noting that not every conflict in the record needs to be reconciled by the ALJ).

Although the ALJ's decision did not explicitly discuss Plaintiff's medications or any associated side effects, the decision and the record indicate that the ALJ considered the issue. First, the ALJ found that in light of all the evidence he considered, "no greater or additional limitations [were] justified" as part of Plaintiff's RFC, which indicates that he considered other possible limitations, but ultimately rejected them (R. at 13). Second, as Defendant correctly points out, the ALJ asked Plaintiff about her medications and any side effects (R. at 278-80). Plaintiff testified that she had a prescription for Wellbutrin, which she was not taking because she was afraid it would make her sleepy (R. at 278-79). When the ALJ asked if her prescription ibuprofen and muscle relaxer caused any side effects, Plaintiff replied "No" (R. at 280). This testimony, as well as other substantial evidence in the record, supports the ALJ's determination not to incorporate side effects from medication in Plaintiff's RFC because, it indicates that

47

when Plaintiff experienced negative side effects she stopped taking the associated

medication. For example, Plaintiff argues that Zoloft gives her headaches and causes

her to grind her teeth, but she also testified that she stopped taking Zoloft for those very

reasons (R. at 279). Similarly, Plaintiff stopped taking Topamax, Ativan, Ambien,

Celexa, Prozac (R. at 192), and Effexor (R. at 189) because of negative side effects or

lack of positive effects. Moreover, Plaintiff's own testimony indicates that the pain

medication and muscle relaxants she continued to take did not have any side effects (R.

at 280). Based on a review of the record, the Court cannot say the ALJ erred in failing to

include side effects from medication in Plaintiff's RFC.

### 6. Plaintiff's Sixth Allegation: The ALJ Improperly Considered Plaintiff's Lack of Prescribed Therapy.

20.  Relying on 20 C.F.R. § 404.1530, Plaintiff also argues "the ALJ erred by

drawing negative inferences against [Plaintiff] because she was not consistently

receiving therapy from a psychiatrist." Plaintiff's Brief, pp. 34-35.

The regulations require an ALJ to deny benefits to a claimant who does not

follow prescribed treatment that can restore his or her ability to work, and who does not

have an acceptable reason for that refusal. 20 C.F.R. §§ 404.1530(a)-(c); 416.1530(a)-

(c). Courts have remanded where an ALJ improperly relied on a claimant's failure to

seek treatment, without considering the claimant's explanation. see, e.g., Shaw v.

Chater, 221 F.3d 126, 133 (2d Cir. 2000). However, this precedent does not apply in

this case.

Here, the ALJ did not deny Plaintiff benefits because she refused prescribed

treatment or refused to seek treatment. To the contrary, the ALJ noted that Dr. Miller

48

and Dr. Tater did not prescribe therapy as part of Plaintiff's treatment. Unlike the regulations and case law upon which Plaintiff relies, here the ALJ did not find Plaintiff refused prescribed treatment or failed to seek treatment, but noted the limited nature of the treatment recommended when Plaintiff sought help. Therefore, the ALJ did not violate 20 C.F.R. § 404.1530, nor did he err in discussing the absence of prescribed therapy. See also Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (An ALJ "is entitled to rely not only on what the record says, but also on what the record does not say.").

### 7. Plaintiff's Seventh Allegation: The ALJ Improperly Relied on VE Testimony that Did Not Fully Account for Plaintiff's Limitations.

21.  Plaintiff argues that the ALJ improperly relied on the testimony of VE, Mr. Garozzo, to the effect that someone with Plaintiff's RFC could be a housekeeper because the VE did not fairly consider Plaintiff's additional impairments and limitations. Plaintiff's Brief, pp. 27-29.

Because the Court has already recommended remand for the ALJ to reconsider several aspects of his RFC finding, it will not consider this issue.

### 8. Plaintiff's Seventh Allegation: The Commissioner Did Not Meet His Burden of Proof at Step Five.

22.  Plaintiff argues, relying inter alia on Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000), that the Commissioner bears the burden of proof at step five and that he must "produce affirmative evidence that the claimant can perform work." Plaintiff's Brief, pp. 13-14.

Plaintiff mistakenly relies on Curry and other Second Circuit cases that have been abrogated by changes made to the regulations in August 2003. See 68 Fed. Reg.

49

51153, 51159 (Aug. 26, 2003). Specifically, 20 C.F.R. §§ 404.1560(c)(2) and 416.960(c)(2) explain that the Commissioner is "not responsible for providing additional evidence about [a claimant's] residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if [a claimant] can do [her] past relevant work." Therefore, Plaintiff's argument on this point must fail.

**Conclusion**

23.  Based on the foregoing, it is recommended that the Court GRANT Plaintiff's motion in part, DENY Defendant's motion, and REMAND to the Commissioner for further proceedings consistent with this ruling.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

DATED:
April 15, 2009
Syracuse, New York

**Order**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

50

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir.1988).

**SO ORDERED**.

DATED: April 15, 2009

Syracuse, New York

Victor E. Bianchini
United States Magistrate Judge